"O"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LESLIE VAN HOUTEN, | Case No.  CV 09-09355 AG (AN) |
| Petitioner, | |
| v. | REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |
| DAWN DAVISON, Warden, | |
| Respondent. | |

This Report and Recommendation is submitted to the Honorable Andrew J. Guilford, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.  For the reasons reported below, the Magistrate Judge recommends that the court deny the petition for writ of habeas corpus by a person in state custody ("Petition") pursuant to 28 U.S.C. § 2254 and dismiss this action with prejudice.

## I. BACKGROUND

**A.     State Court Proceedings**

On August 17, 1978, petitioner Leslie Van Houten ("Petitioner") began serving a sentence of life in state prison after her conviction by a jury in the California Superior Court for Los Angeles County (case no. A253156) of two counts of first degree murder

and one count of conspiracy to commit first degree murder, arising out of her role in the infamous "Manson Family" murders of Rosemary and Leno LaBianca. (Respondent's Lodged Document ("LD") 1 at 1); *see also People v. Van Houten*, 113 Cal. App. 3d 280, 284, 170 Cal. Rptr. 189 (1980); *In re Van Houten*, 116 Cal. App. 4th 339, 347, 10 Cal. Rptr. 3d 406 (2004).

Petitioner was originally convicted in 1971 of the same three counts in a joint trial with codefendants Charles Manson, Patricia Krenwinkel and Susan Atkins, after which all the defendants received the death penalty. *People v. Manson*, 61 Cal. App. 3d 102, 123-24, 132 Cal. Rptr. 265 (1976). However, the state court of appeal reversed Petitioner's conviction on August 13, 1976, due to the disappearance of her trial attorney before the trial concluded. *Id.* at 217.[1] Petitioner was then tried again on the same charges, and her second trial resulted in a mistrial because the jury was deadlocked. *People v. Van Houten*, 113 Cal. App. 3d at 283. Petitioner's current life sentence is being served pursuant to her convictions in a third trial. *Id.* at 284; *see also In re Van Houten*, 116 Cal. App. 4th at 347.

On August 30, 2007, a parole consideration hearing was held for Petitioner at the California Institution for Women in Corona, California. A panel of the California Board of Parole Hearings ("Board") found Petitioner unsuitable for parole and deferred her next hearing for two years. (LD 1.) Petitioner challenged the August 30, 2007 decision by filing subsequent habeas petitions in the California Superior Court for Los Angeles County (case no. BH005534) and the California Court of Appeal (case no. B218604), and then a petition for review in the California Supreme Court (case no. S176461), all of which were denied. (LD 2-10.) The superior court denied the first

---

[1] Petitioner was the only defendant whose conviction was ultimately reversed on appeal. Additionally, while her appeal was pending, the California Supreme Court decided *People v. Anderson*, 6 Cal. 3d 628, 100 Cal. Rptr. 152 (1972), which invalidated the death sentence for all four defendants. *See Manson*, 61 Cal. App. 3d at 124.

1  petition in a reasoned decision, and the state court of appeal and California Supreme

2  Court denied the second and third petitions without comment.  (LD 6, 8, 10.)

3  **B.    Pending Proceedings**

4         On December 22, 2009, Petitioner, through her counsel, filed the pending Petition

5  containing three claims, two of which comprise her principal argument that the state

6  courts' approval of the Board's August 30, 2007 decision finding her unsuitable for

7  parole was an unreasonable application of the California "some evidence" requirement,

8  and was based on an unreasonable determination of the facts in light of the evidence.

9  (Pet. at 5-6; Petitioner's Memorandum of Points and Authorities ("Mem.") (dkt. 2) at

10 1-32.)  Respondent filed an Answer arguing that Petitioner's claims lack merit because

11 she has not shown any violation of clearly established Supreme Court precedent, and

12 that she also failed to demonstrate the state courts unreasonably determined the facts in

13 the record.  (Answer at 4-19.)

14        Three days after Respondent filed the Answer, the Ninth Circuit issued its en

15 banc opinion in *Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010).  In order to give

16 the parties an opportunity to address *Hayward*'s impact on Petitioner's claims, the court

17 issued an order directing Respondent to file a supplemental brief.  (4/26/10 Order (AN)

18 (dkt. 16).)  Respondent subsequently filed a supplemental *Hayward* brief (dkt. 22), and

19 Petitioner then filed a Reply addressing both Respondent's Answer and *Hayward*'s

20 impact on her claims (dkt. 23).  The matter now stands submitted.

## II. DISCUSSION

22 **A.    Standard of Review**

23        Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

24 Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, a federal court may not grant a state

25 prisoner's application for habeas relief for any claim adjudicated on the merits in state

26 court proceedings unless the adjudication of the claim resulted in a decision that was:

27 (1) "contrary to, or involved an unreasonable application of, clearly established Federal

28 law, as determined by the Supreme Court of the United States[;]" or (2) "based on an

1  unreasonable determination of the facts in light of the evidence presented in the State

2  court proceeding." § 2254(d); *see Rice v. Collins*, 546 U.S. 333, 334, 126 S. Ct. 969

3  (2006); *Williams v. Taylor*, 529 U.S. 362, 405-09, 120 S. Ct. 1495 (2000); *Anderson v.*

4  *Terhune*, 516 F.3d 781, 786 (9th Cir. 2008) (*en banc*).

5  "Clearly established Federal law" refers to the governing legal principle or

6  principles established by the Supreme Court's holdings, not dicta, at the time the state

7  court renders its decision. *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S. Ct. 1166

8  (2003); *Carey v. Musladin*, 549 U.S. 70, 74, 127 S. Ct. 649 (2006). "What matters are

9  the holdings of the Supreme Court, not the holdings of lower federal courts." *Plumlee*

10  *v. Masto*, 512 F.3d 1204, 1210 (9th Cir. 2008) (*en banc*). Where no decision of the

11  United States Supreme Court "squarely addresses" an issue or provides a "categorical

12  answer" to the question before the state court, § 2254 (d)(1) bars relief because the state

13  court's adjudication of the issue cannot be contrary to, or an unreasonable application

14  of, governing Supreme Court law. *Wright v. Van Patten*, 552 U.S. 120, 123-26, 128 S.

15  Ct. 743 (2008); *Moses v. Payne*, 555 F.3d 742, 753 (9th Cir. 2009).

16  A state court decision is "contrary to" governing Supreme Court law if it: (1)

17  applies a rule that contradicts the governing Supreme Court law; or (2) "confronts a set

18  of facts . . . materially indistinguishable from a decision of [the Supreme Court] but

19  reaches a different result." *See Brown v. Payton*, 544 U.S. 133, 141, 125 S. Ct. 1432

20  (2005); *Williams*, 529 U.S. at 405-06. The Supreme Court has emphasized that citation

21  of its cases is not required so long as "neither the reasoning nor the result of the state-

22  court decision contradicts [its governing decisions]." *Early v. Packer*, 537 U.S. 3, 8,

23  123 S. Ct. 362 (2002); *see also Bell v. Cone*, 543 U.S. 447, 455, 125 S. Ct. 847 (2005);

24  *see e.g.*, *DeWeaver v. Runnels*, 556 F.3d 995, 1002 (9th Cir. 2009). What matters is

25  whether the last reasoned *decision* reached by the state court was contrary to governing

26  Supreme Court law, not the intricacies of the analysis. *Hernandez v. Small*, 282 F.3d

27  1132, 1140 (9th Cir. 2002).

28  A state court decision involves an "unreasonable application" of governing

4

Supreme Court law if the state court:  (1) identifies the correct governing Supreme Court law but unreasonably applies the law to the facts; or (2) unreasonably extends a legal principle from governing Supreme Court law to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 407; *Briceno v. Scribner*, 555 F.3d 1069, 1076 (9th Cir. 2009).  Further, unreasonable application requires the state court decision to be "objectively unreasonable, not just incorrect or erroneous." *Andrade*, 538 U.S. at 65; *Wiggins v. Smith*, 539 U.S. 510, 520-21, 123 S. Ct. 2527 (2003).

In applying § 2254(d)'s standards, federal courts must look to the last reasoned state court decision. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008).  Where no reasoned opinion exists because the state courts rejected a claim without comment, federal courts must conduct an independent review to determine whether the state courts' unexplained decisions were contrary to, or involved an unreasonable application of, "clearly established" governing Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029 (2003) ("*Miller-El I*") (citing 28 U.S.C. § 2254(e)(1)); *see e.g.*, *Moses*, 555 F.3d at 745 n.1; *Tilcock v. Budge*, 538 F.3d 1138, 1141 (9th Cir. 2008).

AEDPA's deferential standard applies to Petitioner's federal parole claims. Petitioner raised them at each level of the state courts, the last of which was a petition for review in the California Supreme Court.  (LD 9.)  Although the state high court denied these claims without comment or citation (LD 10), that court's silent denial still constitutes a denial "on the merits" for purposes of federal habeas review, and AEDPA's deferential standard of review applies. *Hunter v. Aispuro*, 982 F.2d 344, 348 (9th Cir. 1992); *Gaston v. Palmer*, 417 F.3d 1030, 1038 (9th Cir. 2005), *amended by*, 447 F.3d 1165 (9th Cir. 2006) ("We construe 'postcard' denials such as these to be decisions on the merits").  Further, under the "look through" doctrine, federal habeas

courts determine what level of deference to apply by looking through the unexplained state court summary denials to the last reasoned state court decision, which in this case was the superior court's order denying state habeas relief. *Ylst v. Nunnemaker*, 501 U.S. 797, 802-06, 111 S. Ct. 2590 (1991); *see also Pirtle v. California Board of Prison Terms*, 611 F.3d 1015, 1020 (9th Cir. 2010).

**B.    Board/State Court Findings**

At the conclusion of Petitioner's August 30, 2007 parole consideration hearing, the Board found Petitioner unsuitable for parole as follows:

The Panel reviewed all information received from the public and relied on the following circumstances and the totality of the record in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.

[The] [P]anel has come to this conclusion first and foremost by the commitment offense itself. The offense was carried out in an especially cruel and callous manner. There were multiple victims attacked, two killed in the same incident. The offense was carried out in a dispassionate and calculated manner. The victims were abused and mutilated in the offense. The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, and the motive for the crime was inexplicable in relation to the offense. These conclusions are drawn from the totality of the record and the Statement of Facts[. . . .]

[We] should state and be clear at this point that this is not a hearing for Charles Manson or any of those known as a group to have been the Manson Family. This is a hearing for Leslie Van Houten. There are many aspects of this case that may never be clear. What is clear is that we do not discount the strides and accomplishments that Miss Van Houten has [made]. Nor are we here to suppose what may have happened had Miss

6

Van Houten been tried at a different time and under a different set of laws or penalties.  Right or wrong, Miss Van Houten's conviction is what it is, no more and no less.  What this Panel is here to consider are the crimes for which she [was] convicted as well as her progress since incarceration.  To that end and with regard to the crime itself, we have a young woman who made choices, those choices including being involved in drugs, being involved with the Manson Family, and after she recognized that the Family was turning violent and criminal, when the acts of violence began, the record shows that she was disappointed in not having been included, and when she went along in the vehicle with the other members of the Manson Family she had choices and decision points.  In every case she made the choice to participate and in fact be an active participant in this crime.  For reasons that defy all logic and reason, Miss Van Houten chose, chose to and in fact sought out becoming an active participant in the brutal deaths of Leo . . . and Rosemary LaBianca.

[These] victims were attacked in one of the most fearful and in the most fearful way possible, that of a home invasion.  They were attacked in their own home and brutally murdered, Rosemary LaBianca having to listen to the dying sounds of her Leo.  In these brutal deaths -- or, as if these brutal deaths were not enough, the proposed purpose of these murders was to start a race war.  This also defies all logic and reason and compounds the heinous nature of the crime and Miss Van Houten's direct and active participation in the murders and the ultimate goal of the race war.  Regardless of how twisted or implausible that goal, the desire to wreak that level of violence on society in combination with the actual violence visited upon the victims in this crime makes this crime truly exceptional and goes well beyond the minimum necessary for a conviction of murder in the first degree.  Neither victim posed a threat to Miss Van

7

1    Houten or any of her crime partners.

2         [With] regard to a prior record, the Panel finds that while there are

3    no conviction[s] there is certainly undeniable evidence and statements of

4    extensive drug use and at least peripheral association with crimes

5    associated with the support of a communal life.   With regard to

6    institutional behavior, you have a record that is unparalleled of anyone that

7    I'm familiar with.   You have one 128a[2/] that was in 1981, and as far as

8    we can tell, no 115s[3/] that we can find in the record. . . .

9                                   * * * * *

10        . . . With regard to the psychological evaluation of August 2007 by

11   Dr. Kropf, the [P]anel finds that [in] both that report and the supplemental

12   report prepared by Dr. Smith the doctors are clearly supportive.

13        [With] regard to parole plans, we find that with regard to Crossroads

14   that the parole plans are appropriate.   As an informational item, the Panel,

15   based on the experience of members of the Panel, believes that the job

16   offers relating to a law office, if the duties involve frequent and direct

17   contact with criminals, would not be a plan that would be considered

18   appropriate by the Parole Division, and this is just informational because,

19   again, we think you have other alternatives, but we believe that to be the

20   case.

21

22

23

24   ─────────────

25   2/   "128(a)" refers to the form required to document an inmate's minor misconduct.
     CAL. CODE REGS. tit. 15, § 3312(a)(2).

26

27   3/   "115" refers to the form required to report an inmate's misconduct that "is
     believed to be a violation of law or is not minor in nature."   CAL. CODE REGS. tit. 15,

28   § 3312(a)(3).

[With] regard to the 3042 notices,[4] we do note that the District Attorney from Los Angeles County was here in person by representative and does oppose parole.  Nevertheless, we do want to commend you for several things, and Commissioner Williams will now detail those.

**Deputy Commissioner Williams:** As we indicated, your violations here have been minimal, and we'd encourage you to remain disciplinary free.  You have participated.  You've gotten a college degree.  You've participated in a variety of vocational things.  We'd encourage you to just maintain that and to continue to participate.  You[r] work record, you're still tutoring, you're still helping others, and that's very good.

**Inmate Van Houten:** Thank you.

**Deputy Commissioner Williams:** I encourage you with that.

**Inmate Van Houten:** Thank you.

**Deputy Commissioner Williams:** Your group activities, you seem to keep busy with things that not only help you but are a benefit to others, so I encourage you with that as well.

**Inmate Van Houten:** Thank you.

**Deputy Commissioner Williams:** And commend you.

**Presiding Commissioner Davis:** However, these positive aspects of behavior do not outweigh the factors for unsuitability.

[In] a separate decision the hearing Panel finds that the prisoner has been convicted of murder and it is not reasonable to expect that parole would be granted during the next two years.  [The Board then again read the same factors and considerations discussed above into the record.]

[With] regard to other information bearing on suitability, the Panel further finds that even after all of this time and after all of the laudable

---

[4] *See* CAL. PENAL CODE § 3042(a).

9

accomplishments by Miss Van Houten, including her degree, she unfortunately still does not seem to understand or express the nature and enormity of what she and her crime partners were trying to do. We come to this based in part on the Panel's finding that she continues to minimize the racial nature of the crime at the time when one could argue we are at a tipping point of racial violence and the clear selection of the victims to incite such violence. Secondly, we further come to this conclusion in reviewing Miss Van Houten's recent psych evaluation. The Panel is struck by the characterization of the reluctance Miss Van Houten ascribes to her actions on the night of the murder. I'll refer to the current psychological evaluation on page 5, which states that:

> "When asked for her account of the offense, Miss Van Houten stated: 'The first night, the first night of the Tate murder, Pat had gone -- Pat had taken me under her wing and I had gotten close to her. She had crossed over to the cause. I needed to commit to the cause. At that time ten or twelve of us were giving the impression that we were dedicated to starting Helter Skelter. Up until that time he (Charles Manson) asked us if we would do it. We said yes. The second night we got into the car. For a while we drove around looking for victims. When we got to the house, he went in. Tex --[] or, excuse me -- []he and Tex entered the house. He came back to the car and told Pat and I to go into the house. I was starting to get nervous. I still felt I could do this. We went in. Mr. and Mrs. LaBianca were on the couch. There was controversy about the pillowcase. I don't remember her face. I believe the pillowcase was already on her. I could be wrong. I was nervous. Pat went into the

kitchen to get a knife.  She then went into the bathroom and we were supposed to kill her.  She had a cord around her neck.  I held her down.  She could hear her husband dying.  Pat stabbed her in the shoulder and the knife bent.  I was really shaky.  I really wanted out and there was no way out.  I knew I had to commit myself.  I ran and told Tex we couldn't kill her.  Pat went to the living room and Mr. LaBianca was dead.  When I heard Mr. LaBianca dying, it [was] more than I could handle.  I called Tex.  I stood in the doorway and looked into an empty room while Tex killed her.  Tex turned around and handed me a knife and said, 'Do something.'  I stabbed [Mrs.] LaBianca, who was on --[] well, excuse me.  []I stabbed [Mrs.] LaBianca, who was on her back.  I stabbed her in her lower portion of her back 16 or 18 superficial wounds, which surprised me when I heard this.  The act was extremely predatory.  I used an example when you see a shark attack meat.  I felt unnatural.  Tex came in and wanted her clothes.  Tex did both murders.  He told me to get Rosemary's clothes.  I did everything I could to embrace the reality of it.'"

The record of the Court of Appeals shows actions far more consistent with an aggressor than a reluctant participant.  As such, and with all respect to the doctors, this Panel still finds that the inmate, Miss Van Houten, is in fact an unpredictable danger to society or a threat to public safety and, as such, a longer period of incarceration is required.

(LD 1 at 169-81.)

///

In affirming the above decision on state habeas review, the superior court made

1   the following findings of fact[5/] and legal conclusions:

2         Having independently reviewed the record, giving deference to the broad

3         discretion of [the Board] in parole matters, the Court concludes that the

4         record contains "some evidence" to support the determination that the

5         Petitioner currently presents an unreasonable risk of danger to society and

6         is, therefore, not suitable for release on parole. (Citations omitted.)

7                         * * * * *

8      The record reflects that on August 8, 1969, members of Charles

9   Manson's notorious cult, known as "the Family," murdered Sharon Tate-

10   Polanski, Voytek Frykowski, Abigail Folger, Jay Sebring and Steven

11   Parent in what would later be referred to as the "Tate Murders."  See 2007

12   Board Hearing Transcript ("HT"), pg. 15.  The murders were carried out

13   as a part of Manson's plan to incite a race war, which he believed was

14   prophesized in the Beatles' song "Helter Skelter."  To that end, the group

15   planned to murder white victims in such a manner that black people would

16   be blamed. *Id.*, pg. 14.

17      According to the Appellate Opinion, the Petitioner, who had begun

18   associating with the Family that year, felt "left out" because she had not

19   been involved in the Tate Murders and asked to be included the next time.

20   On August 9, 1969, Charles Manson told the Petitioner and several other

21   members of the Family, including Charles "Tex" Watson and Patricia

22   Krenwinkel, that the Tate Murders had been "too messy" and that he

23   would show them how it should be done. *Id.*, pg. 15.  They drove around

24   that night, looking for potential victims, finally stopping at the home of the

25

26 _____

27   [5/]  As discussed above, the state court's factual determinations are presumed correct

28   where, as here, Petitioner has not proffered clear and convincing evidence to the
    contrary.  § 2254(e)(1); *Miller-El I*, 537 U.S. at 340; *Tilcock*, 538 F.3d at 1141.

victims, Leno and Rosemary LaBianca.  The Petitioner had brought a change of clothing, as instructed, in case her clothing became bloody. Manson and Watson entered the home first and returned several minutes later after they had stolen a wallet from the victims and tied them up.  *Id.*, pg. 16.  Manson and some of the family members then drove away and planted the victim's wallet in a public restroom, hoping a black person would find it, use the credit cards and be blamed for the theft and murders. Before leaving, Manson told the Petitioner and Krenwinkle to go into the house and do whatever Watson told them to do.  *Id.*, pg. 17.

When the Petitioner entered the house, Watson was holding the victims at the point of his bayonet and demanded money.  Mrs. LaBianca gave him a box that held some money.  *Id.*  Watson then told the Petitioner and Krenwinkle to take Mrs. LaBianca into her bedroom and kill her.  The Petitioner and Krenwinkle forced the victim into her room and Krenwinkle retrieved two knives from the kitchen, giving one to the Petitioner.  The Petitioner put a pillowcase over Mrs. LaBianca's head and wrapped a lamp cord around her neck.  Mrs. LaBianca heard the sound of her husband being stabbed to death by Watson in the other room, so she rose from the bed and yelled his name.  Mrs. LaBianca then grabbed the lamp attached to the cord around her neck and attempted to strike the Petitioner with it. The Petitioner wrestled Mrs. LaBianca back down on the bed and pinned her down, allowing Krenwinkle to stab her in the shoulder.  The knife hit Mrs. LaBianca's collarbone with such force, the blade bent.  *Id.*, pg. 18.

The Petitioner called for Watson to help.  Watson came into the bedroom with his bayonet and stabbed Mrs. LaBianca eight times, each wound fatal.  Watson then turned to the Petitioner and told her to "do something."  The Petitioner stated that she felt Mrs. LaBianca was dead, but was not sure.  Still, the Petitioner stabbed Mrs. LaBianca in the lower

13

back area numerous times.  Mrs. LaBianca was stabbed a total of 42 times. *Id.*, pg. 19.  The Petitioner then wiped away any finger prints and drank some chocolate milk from the victims' refrigerator while Krenwinkle wrote on several surfaces of the home in the victims' blood.  The Petitioner also put on some of Mrs. LaBianca's clothing, as instructed by Watson, and threw her other clothing in a nearby dumpster.  *Id.*, pg. 20.

The record also indicates that another member of the Family later testified that after the LaBianca murders, the Petitioner told her that she had "stabbed a woman who was already dead and that the more she did it, the more fun it was."  *Id.*, pgs. 19-20.  The Petitioner hid out at Spahn Ranch until she was arrested on November 25, 1969.  *Id.*, pg. 20.  She was 19 years old at the time of the murders.  *Id.*, pg. 12.

The Board found the Petitioner unsuitable for parole after a parole consideration hearing held on August 30, 2007.  The Petitioner was denied parole for two years.  The Board concluded that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety.  The Board based its decision on several factors, including her commitment offenses, her level of insight into her offenses and her history of drug use and involvement in the Family.

The Court finds that there is some evidence to support the Board's findings that multiple victims were killed, that the offenses were carried out in a dispassionate and calculated manner, that the victims were abused, that the offenses demonstrated an exceptionally callous disregard for human suffering and that the motive was inexplicable in relation to the offenses.  (Citations omitted.)

The Petitioner assisted her crime partners in carrying out the murders of both victims and personally attacked Mrs. LaBianca.  The

Petitioner participated in the planning of the murders, asked to be involved, brought a change of clothing with her to replace what she assumed would be her bloodied clothing and then assisted her crime partners in murdering the unarmed, bound victims in an execution-style manner. This was a dispassionate and calculated attack. The victims were bound, threatened and then stabbed numerous times. Mrs. LaBianca listened to the sounds of her husband dying in the next room, before she was brutally killed. The victims were subjected to prolonged mental and physical anguish and were abused during the offense, which demonstrated an exceptionally callous disregard for their suffering. (Citation omitted.) Additionally, the motive for the Petitioner's participation in the offense was that she believed in Manson's predictions about the need to incite a race war and because she felt "left out" after she was not involved in the Tate Murders. There is no evidence that the victims had provoked the Petitioner or any of her crime partners in any way, nor that they had any relationship whatsoever with anyone involved in the murders. The random selection of the innocent victims, supposedly meant to follow a fictional race war prophesy is inexplicable in relation to the brutal double homicide that took place.

After a long period of time, a commitment offense may no longer indicate a current risk of danger to society in light of a lengthy period of positive rehabilitation. (Citation omitted.) However, a commitment offense may continue to be predictive of current danger, even after decades of attenuation, if it was especially brutal, such as a hate crime or a crime involving torture. (Citation omitted.) Here, the facts of the murders included evidence of every factor tending to show unsuitability in Cal. Code Regs., tit. 15, §2281, subd. (c)(1). The brutal offenses were committed with the intent of framing a black person and inciting a race

15

war.  The victims were arguably tortured, as they were bound, threatened and then repeatedly stabbed to death.  Mrs. LaBianca listened to her husband dying in the next room as the Petitioner held her down in order for Krenwinkle to stab her.  The Board is not required to release an inmate if the gravity of the commitment offense indicates a continued danger to public safety.  (Citations omitted.)  The notorious murders, for which the Petitioner was convicted, are so "heinous, atrocious or cruel" that her due process rights are not violated by the denial of parole based on the gravity of those offenses.  (Citation omitted.)

In addition to the commitment offenses, the Board considered the Petitioner's lack of insight regarding the offenses.[3]  (Citation omitted.) The Board found that the Petitioner did not understand the enormity of her offenses and that she continues to "minimize the racial nature" of the offenses.  The Board noted that the Petitioner has portrayed herself as a reluctant follower when discussing her offense, as documented in her most recent psychological evaluation.  See 2007 Psychological Report, pg. 5. The Board also noted that the Petitioner did not fully take personal responsibility for the race-related motivation for the offenses, as exemplified by her statement at the hearing that "I didn't even think of it in terms of being racist. He - it was presented as a[n] eventual outcome . . ." HT, pgs. 85-86.  Where guilt is not at issue, an inmate's version of the offense may be evidence that she lacks remorse or does not understand the nature and magnitude of the offense.  (Citation omitted.)  The Petitioner's continued lack of insight into her offenses, despite years of rehabilitative programming[,] reflect[s] that her mental state has not completely changed from the time of the offenses and provides some evidence that she remains a current risk of danger to society.  (Citation omitted.)

[3]  Although the Board cites this factor in the

16

separate decision finding that it would not be
reasonable to expect the Petitioner to be
released in the next two years, the Court finds
that the Board also considered the Petitioner's
lack of insight as a basis for denying her parole.

The Board also considered the Petitioner's arrests in the year before the commitment offenses, her drug use from an early age, as well as her year of association with the Family. While these factors, alone, may not justify a finding of unsuitability, the Board may properly consider them as they are relevant to a determination of whether the Petitioner is suitable for parole. (Citation omitted.)

Additionally, the Board considered the District Attorney's opposition to the Petitioner's release. Although the District Attorney's opposition is not a factor on which the Board may rely to deny parole, the Board is required to consider such opposition. (Citation omitted.)

The Board also considered the Petitioner's post-conviction gains, including earning her B.A. degree and working as a tutor for many years. It also considered the Petitioner's participation in numerous self-help programs, Alcoholics Anonymous, Narcotics Anonymous and several life skills programs. The Board further considered the Petitioner's exemplary institutional behavior, free of any serious discipline throughout her entire incarceration. Additionally, the Board considered the Petitioner's psychological report, which indicated that she poses a low risk of future violence. However, they still concluded that the Petitioner would pose an unreasonable threat to public safety. (Citation omitted.) The Court finds that there is some evidence to support this determination because the Petitioner's commitment offenses were so "heinous, atrocious or cruel" that her due process rights are not violated by the denial of parole on that

1     basis and because of her continued lack of complete insight into her

2     offenses.

3        The Court finds that the Board did not err in denying the Petitioner

4     parole for a period of two years.  The Board must articulate reasons that

5     justify a postponement, but those reasons need not be completely different

6     from those justifying the denial of parole. (Citation omitted.)  The Board

7     indicated that the Petitioner was denied parole for two years because of her

8     especially "heinous, atrocious or cruel" and notorious commitment

9     offenses, her previous involvement in drugs, crime and the Family cult, as

10     well as her continued lack of complete insight into her offenses.  These

11     reasons were sufficient to justify a two-year denial.

12 (LD 6.)

13 **C.    Due Process Claims**

14     In grounds one and two, Petitioner alleges a violation of her right to federal due

15 process.  She claims the state courts unreasonably upheld the Board's denial of parole

16 because that decision was not supported by "some evidence" in the record that she

17 poses a current threat to public safety.  She also contends the Board's and superior

18 court's finding that she continues to lack insight into her offenses was based on an

19 unreasonable determination of the facts in light of the evidence.  In ground three,

20 Petitioner claims the continual denial of parole has effectively converted her sentence

21 of life with the possibility of parole to life *without* the possibility of parole, which she

22 contends constitutes cruel and unusual punishment in violation of the Eighth

23 Amendment.  (Mem. at 1-32; Reply at 3-19.)

24     Respondent contends the state court decisions upholding the denial of parole

25 were not contrary to or unreasonable applications of clearly established Supreme Court

26 precedent.  (Answer at 4-19.)

27     **1.    Legal Standard for Federal Due Process Parole Claims**

28     It is clearly established that a person validly convicted of a crime has no

18

constitutional right to be released before the expiration of his sentence. *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 7, 99 S. Ct. 2100 (1979); *Meachum v. Fano*, 427 U.S. 215, 224, 96 S. Ct. 2532 (1976) ("given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty . . ."). Because "parole-related decisions are not part of the criminal prosecution, 'the full panoply of rights due a defendant in such a proceeding is not constitutionally mandated.'" *Jancsek v. Oregon Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987) (*quoting Pedro v. Oregon Parole Board*, 825 F.2d 1396, 1399 (9th Cir. 1987)); *see also Ford v. Wainwright*, 477 U.S. 399, 429, 106 S. Ct. 2595 (1986) ("once society has validly convicted an individual of a crime and therefore established its right to punish, the demands of due process are reduced accordingly").

Consistent with *Greenholtz*, in *Hayward* an en banc panel of the Ninth Circuit held that "in the absence of state law establishing otherwise, there is no federal constitutional requirement that parole be granted in the absence of 'some evidence' of future dangerousness or anything else." *Hayward*, 603 F.3d at 561. In doing so, the *Hayward* court expressly overruled prior precedent in this circuit, specifically *Irons v. Carey*, 505 F.3d 846 (9th Cir. 2007); *Biggs v. Terhune*, 334 F.3d 910, 914-15 (9th Cir. 2003); *Sass v. California Board of Prison Terms*, 461 F.3d 1123 (9th Cir. 2006), and its earlier three-judge panel decision in *Hayward v. Marshall*, 512 F.3d 536, 542 (9th Cir. 2008), all of which held that "a parole-eligible prisoner has a constitutional right to be released unless there is 'some evidence' of future dangerousness." *Hayward*, 603 F.3d at 555. *Hayward* expressly "overrule[d] those decisions to the extent they may be read to mean that." *Id.*

*Hayward* also concluded "the due process clause does not, by itself, entitle a prisoner to parole in the absence of some evidence of future dangerousness, state law may supply a predicate for that conclusion[,]" therefore, it is necessary to look to California's parole scheme to determine whether it "create[s] liberty interests in parole release that are entitled to protection under the Due Process Clause." *Id.* at 561 (*quoting*

1   *Board of Pardons v. Allen*, 482 U.S. 369, 371, 107 S. Ct. 2415 (1987)).

2       The *Hayward* court then found that, under California's parole scheme, there is

3   a right to parole "in the absence of some evidence of future dangerousness." *Id.* at 562.

4   But, *Hayward* expressly declined to determine "whether the California parole scheme

5   establishes a predicate for imposing [the "some evidence" standard] as a matter of

6   federal constitutional law" based upon the doctrine of constitutional avoidance, i.e.,

7   because "[s]tate law already does what *Hayward* would have federal constitutional law

8   do." *Id.*; *but see Pearson v. Muntz*, 606 F.3d 606, 608-09 (9th Cir. 2010) (construing

9   *Hayward* in dicta as holding "that compliance with the state requirement is mandated

10  by federal law, specifically the Due Process Clause.").

11      *Hayward* further found that in *In re Lawrence*, 44 Cal. 4th 1181, 82 Cal. Rptr. 3d

12  169 (2008), and *In re Shaputis*, 44 Cal. 4th 1241, 82 Cal. Rptr. 3d 213 (2008), the

13  California Supreme Court decided "that as a matter of state law, 'some evidence' of

14  future dangerousness is indeed a state *sine qua non* for denial of parole in California."

15  *Hayward*, 603 F.3d at 562.  More specifically, *Hayward* found *Lawrence* and *Shaputis*

16  established that:

17        As a matter of California law, the paramount consideration for both

18      the Board [of Prison Terms] and the Governor under the governing

19      statutes is whether the inmate currently poses a threat to public safety.

20      There must be some evidence of such a threat, and an aggravated offense

21      does not, in every case, provide evidence that the inmate is a current threat

22      to public safety.  The prisoner's aggravated offense does not establish

23      current dangerousness unless the record also establishes that something in

24      the prisoner's pre- or post-incarceration history, or his or her current

25      demeanor and mental state supports the inference of dangerousness.  Thus,

26      in California, the offense of conviction may be considered, but the

27      consideration must address the determining factor, a current threat to

28      public safety.

1  *Id.* (quotations and citations to footnotes omitted).  As a result, *Hayward* held that

2  federal district courts faced with a California prisoner's habeas petition challenging an

3  adverse parole decision "need only decide whether the California judicial decision

4  approving [a] decision rejecting parole was an 'unreasonable application' of the

5  California 'some evidence' requirement, or was 'based on an unreasonable

6  determination of the facts in light of the evidence.'"  *Hayward*, 603 F.3d at 562-63

7  (*citing* §§ 2254(d)(1)&(2)).[6/]

8      Additionally, even if an inmate satisfies the above standard, federal habeas relief

9  is limited to "a redetermination by the Board consistent with the state's 'some evidence'

10  requirement," not release on parole.  *Haggard v. Curry*, --- F.3d ----, No. 10-16819,

11  2010 WL 4978842, at *5 (9th Cir. Dec. 9, 2010) (en banc).

12      **2.   Analysis**

13      After carefully considering the superior court's decision and the Board's findings

14  in light of the record and *Hayward*, the court finds there is no merit to Petitioner's

15  federal due process parole claims.  The superior court's order reflects it reasonably

16  found the Board's decision was based on "some evidence" of current dangerousness in

17  the record.

18      The record establishes the Board based its decision on the following factors,

19  which are authorized by the California Code of Regulations for finding an inmate

20

21

22

23  _____

24  [6/] *Hayward* does not explain why it is necessary for a court sitting on federal habeas

25  review to make such a determination under state law, or how its decision can be

     reconciled with § 2254(d)(1) and *Estelle v. McGuire*, 502 U.S. 62, 112 S. Ct. 475

26  (1991), where the Supreme Court clearly established that "federal habeas corpus relief

27  does not lie for errors of state law.  Today, we reemphasize that it is not the province

     of a federal habeas court to reexamine state-court determinations on state-law

28  questions."  *McGuire*, 502 U.S. at 67-68.

unsuitable for parole[7]:  (1) the commitment offense was carried out in an especially cruel and callous, dispassionate and calculated manner, as well as in a manner which demonstrated an exceptionally callous disregard for human suffering, multiple victims were attacked, abused, mutilated and killed, and the motive for the crime was inexplicable in relation to the offense; (2) Petitioner "unfortunately still does not seem to understand or express the nature and enormity of what she and her crime partners were trying to do"[8]; and (3) Petitioner's arrest history before the crimes contained "undeniable evidence and statements of extensive drug use and at least peripheral association with crimes associated with the support of a communal life."  *See* CAL. CODE REGS., tit. 15, § 2402(b)&(c); (LD 1 at 169-81.)  In upholding the Board's decision, the superior court specifically affirmed the Board's findings as to the gravity of the commitment offenses, Petitioner's lack of insight into her role in committing them, and her prior arrest history.  (LD 6.)  As a result, there was clearly a finding by both the state courts and the Board of "some evidence" of Petitioner's current dangerousness, using the proper criteria under the California Code of Regulations, and Petitioner has failed to show "the California judicial decision approving [the] decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement . . . ."  *Hayward*, 603 F.3d at 563.

Additionally, Petitioner has not established the superior court's reasoned decision

---

[7]    The California Code of Regulations establishes that a finding of parole unsuitability is itself a "judgment of the panel [that] the prisoner will pose an unreasonable risk of danger to society if released from prison."  CAL. CODE REGS. tit. 15, § 2402(a).

[8]   Petitioner has not rebutted the presumption of correctness of the superior court's factual determination that the Board considered her lack of insight as a basis for denying parole.  (*See* Reply at 4-5; LD 6 at 4 n.3.)  The record establishes that, although the Board did not discuss that factor until its decision postponing the next hearing, the Board clearly referred to Petitioner's lack of insight as "other information bearing on suitability."  (LD 1 at 178.)

was "based on an unreasonable determination of the facts in light of the evidence." *Hayward*, 603 F.3d at 562-63; *see also Pirtle*, 611 F.3d at 1021-25 (finding a due process violation where the Board's findings of unsuitability were not supported by the record). First, there is no factual dispute over Petitioner's prior arrest record, drug use, or association with Manson. Second, the facts in the record clearly justify the Board's and superior court's conclusions as to the gravity of the offenses. Petitioner participated in the murder of two randomly selected, unarmed, victims, who were bound and murdered execution-style. The offenses included prolonged physical and mental anguish, threats, and torture, and were committed with the intent of inciting a race war. Petitioner has not disputed these facts, let alone rebutted the presumption of correctness of the superior court's factual determinations (§ 2254(e)(1); *Miller-El I*, 537 U.S. at 340; *Tilcock*, 538 F.3d at 1141), which support the superior court's conclusion that the Board properly relied in part on the gravity of the commitment offense as a factor in finding Petitioner unsuitable for parole. *Hayward*, 603 F.3d at 562-63.

Third, the superior court's approval of the Board's decision based on its finding that "Petitioner's continued lack of insight into her offenses, despite years of rehabilitative programming[,] reflect[s] that her mental state has not completely changed from the time of the offenses and provides some evidence that she remains a current risk of danger to society" (LD 6 at 4), is also based on a reasonable determination of the facts in the record. As is shown below, there is no merit to Petitioner's contention that she is being held accountable for the acts of others (Mem. at 4-5) or her suggestion that the Board's findings as to her "lack of insight" are merely part of its "standard recital" for all parole denials. (Mem. at 2.)

"In some cases, such as those in which the inmate . . . has shown a lack of insight or remorse, the aggravated circumstances of the commitment offense may well continue to provide 'some evidence' of current dangerousness even decades after commission of the offense." *See Lawrence*, 44 Cal. 4th at 1228; *see also In re Lazor*, 172 Cal. App. 4th 1185, 1202, 92 Cal. Rptr. 3d 36 (Cal. Ct. App. 2009) ("An inmate's lack of insight

into, or minimizing of responsibility for, previous criminality, despite professing some responsibility, is a relevant consideration.").  Under California law, "when 'lack of insight' is invoked as a reason to deny parole, such a finding must be based on an identifiable and material deficiency in the inmate's understanding and acceptance of responsibility for his or her commitment offense."  *In re Macias*, 189 Cal. App. 4th 1326, 117 Cal. Rptr. 3d 727, 742 (2010).  However, "where undisputed evidence shows that the inmate has acknowledged the material aspects of his or her conduct and offense, shown an understanding of its causes, and demonstrated remorse," the Board may not conclude the inmate lacks insight or remains currently dangerous.  *Id.*

In explaining what constitutes "an identifiable and material deficiency in the inmate's understanding and acceptance of responsibility," the *Macias* court used examples from other California cases, including *Petitioner's* prior denial of parole:

> Shaputis's claim that he killed his wife unintentionally and accidentally; Rozzo's claim that the killing was not racially motivated and that he did not even participate in it; Smith's claim that her boyfriend was solely responsible for the beating that killed her child; *Van Houten's claim that Charles Manson was the more culpable perpetrator*; and McClendon's claim that he did not plan to kill his estranged wife.  Those claims reflected an unapologetic attempt to make the commitment offenses seem less aggravated than it was and to mitigate the perpetrator's mental state.

*Id.* at 744-45 (italics added).  In contrast to those cases, the minor discrepancies in Macias's account of his crime did "not change the nature of the offense or make his conduct more aggravated than he was willing to acknowledge and accept responsibility for."  *Id.* at 745.

Here, like the examples cited above, the Board's conclusion was based on an identifiable and material deficiency in Petitioner's understanding and acceptance of her own responsibility.  *Id.* at 742.  Specifically, while Petitioner views herself as a reluctant participant in the LaBianca murders, the facts of the offenses "show[] actions

far more consistent with an aggressor than a reluctant participant." (LD 1 at 181.) More specifically, in reaching its "lack of insight" finding, the Board relied on statements Petitioner made in her 2007 psychological report, in which she characterized her role in the LaBianca murders as "nervous," "really shaky," and stated that she "really wanted out and there was no way out." She also stated that she had to do "everything I could to embrace the reality of it." Notably, she omitted from her account the key fact that she and Krenwinkle sought Watson's help only after Mrs. LaBianca grabbed a lamp and fought to defend herself. Instead, Petitioner stated that she "ran and told Tex we couldn't kill her" because when she heard Mr. LaBianca being killed in the next room "it [was] more than I could handle." She also claimed that while Watson was stabbing Mrs. LaBianca to death with the bayonet, she had to look away into an empty room. Additionally, she told the psychologist that stabbing Mrs. LaBianca "felt unnatural." (LD 1 at 178-80; Mem., Ex. B at 5.)

But, as the facts in the record establish, Petitioner's actions were not consistent with her account. After other members of the group committed the grisly and horrific Tate murders, Petitioner's reaction was to feel *left out*. As a result, she specifically asked to participate the next time. She then helped plan the LaBianca murders and brought a change of clothing with her on the night of the offenses in anticipation of her own clothing becoming bloodied. At the scene, Petitioner and Krenwinkle forced Mrs. LaBianca into a bedroom, and then Petitioner put a pillowcase over Mrs. LaBianca's head and wrapped a lamp cord around her neck while her husband was being brutally murdered in the next room. When Mrs. LaBianca grabbed the lamp attached to the cord around her neck and attempted to strike the Petitioner with it, Petitioner wrestled her back to the bed and pinned her down, allowing Krenwinkle to stab her in the collarbone with such force that the blade bent. Petitioner then called for Watson to help, and Watson stabbed Mrs. LaBianca eight times with his bayonet, each wound fatal. Petitioner then personally stabbed Mrs. LaBianca numerous times, later telling another Manson Family member that it became more fun with each stabbing. Then, she took

it upon herself to wipe away fingerprints and drink chocolate milk from the victims'
refrigerator while Krenwinkle wrote on several surfaces of the home in the victims'
blood.  Petitioner also put on some of Mrs. LaBianca's clothing and threw her other
clothing in a nearby dumpster.  (LD 1 at 11-20; LD 6 at 1-4.)[9]  The record firmly
supports the Board's conclusion that Petitioner continues to pose an unreasonable risk
of danger to society in part because of an identifiable and material deficiency in her
understanding and acceptance of responsibility for her crimes.  *Macias*, 117 Cal. Rptr.
3d at 742; *see also Shaputis*, 44 Cal. 4th at 1260 (although the petitioner stated that his
conduct was "wrong," and that he felt remorse, parole was properly denied in part
because he "failed to gain insight or understanding into either his violent conduct or his
commission of the commitment offense."); *In re Rozzo*, 172 Cal. App. 4th 40, 60-63,
91 Cal. Rptr. 3d 85 (2009) (parole properly denied where despite the petitioner's
expressions of remorse, there was evidence that he lacked "insight into the reasons why
he participated in the murder . . . ."); *In re Smith*, 171 Cal. App. 4th 1631, 1637-39, 90
Cal. Rptr. 3d 400 (2009) (despite a showing of remorse, parole properly denied where
the petitioner failed to gain insight into her violent conduct); *Smith v. Hernandez*, No.
CV 08-7954 AHS (JEM), 2010 WL 5561931, *13 (C.D. Cal. 2010) (parole properly
denied where Petitioner's explanation of his role in the commitment offense and related
gang activity indicated that he had not addressed the causative factors of his criminality
despite many years of programming and a lengthy, clean prison disciplinary history).
Also, contrary to Petitioner's assertions, the above facts are particular to *her own* role
in the crimes.  (Mem. at 22-23.)

Petitioner has not shown the superior court's reasoned decision affirming the
denial of parole was "based on an unreasonable determination of the facts in light of the

---

[9]  The Board and the superior court's factual findings were drawn from the factual
determinations made by the California Court of Appeal on direct review of a prior
denial of parole.  *See In re Van Houten*, 116 Cal. App. 4th at 343-46.

1   evidence." *Hayward*, 603 F.3d at 562-63.

2       Further, Petitioner's repeated arguments that the Board's findings were contrary

3   to psychologists' conclusions (Mem. at 2, 7-8, 20-21, 27-31), and her emphasis of her

4   "exemplary conduct" and other positive factors favoring her release (Mem. at 1-2, 4,

5   27, 30), merely manifest her disagreement with the weight the Board gave to certain

6   favorable evidence and do not entitle her to any relief.  It is not for this court to reweigh

7   the evidence before the parole board on federal habeas review.  *Powell v. Gomez,* 33

8   F.3d 39, 42 (9th Cir. 1994).  As discussed in great detail above, the "some evidence"

9   standard merely requires just that -- *some* evidence of future dangerousness, which was

10  established in this case.  *Hayward*, 603 F.3d at 562.  Petitioner's additional allegations,

11  based solely on matters the California Code of Regulations leaves to the discretion of

12  the Board, are not cognizable on federal habeas review.  28 U.S.C. § 2254(a); *McGuire*,

13  502 U.S. at 67-68; *see also* Cal. Code Regs., tit. 15, § 2402(c) ("the importance

14  attached to any circumstance or combination of circumstances in a particular case is left

15  to the judgment of the panel.").

16      On a related note, Petitioner erroneously suggests the Board was required to

17  reach the same conclusions as Petitioner's evaluating psychologist (Mem. at 7-8), and

18  that the Board and superior court failed to cite to "any evidence whatsoever." (Mem.

19  at 1, 7-8, 21, 24-25, 27.)  As discussed above, the Board's "lack of insight" finding was

20  based specifically on Petitioner's own statements as documented in her 2007

21  psychological report, and the Board may consider "[a]ll relevant, reliable information

22  available to the panel."  Cal. Code Regs. tit. 15, § 2402(b).  Further, a factor in

23  determining whether evidence before the Board has an adequate "indicia of reliability"

24  is whether the prisoner was afforded an opportunity to appear and present contrary

25  evidence.  *Morales v. California Dept. of Corrections*, 16 F.3d 1001, 1005 (9th Cir.

26  1994), *overruled on other grounds*, 514 U.S. 499, 115 S. Ct. 1597 (1995).  In this case,

27  Petitioner was present with counsel at her August 30, 2007 hearing but did not object

28  to that portion of her 2007 psychological report when it was read into the record, nor

1   did she or her counsel proffer anything to show she did not make the statements it
2   reflected. (LD 1 at 178-81.) Petitioner has not demonstrated the Board improperly
3   relied on her statements as evidence bearing on her parole suitability. *Morales*, 16 F.3d
4   at 1005.

5          In conclusion, the state judicial decisions affirming the Board's denial of parole
6   in this case were not unreasonable applications of the California "some evidence"
7   requirement, nor were they "based on an unreasonable determination of the facts in light
8   of the evidence." *Hayward*, 603 F.3d at 562-63. Because the record establishes there
9   was some evidence of future dangerousness supporting the Board's August 30, 2007
10  decision, no due process violation has occurred, even under Ninth Circuit case law.
11  Petitioner is not entitled to federal habeas relief on this claim.

12  **D.     Eighth Amendment Claim**

13         Petitioner makes one last perfunctory argument that the Board's "sordid process"
14  has effectively converted her prison term to life without the possibility of parole, which
15  she claims violates the Eighth Amendment's proscription of cruel and unusual
16  punishment. (Mem. at 31.) This claim fails for several reasons. First, Petitioner cites
17  no clearly established Supreme Court precedent for the proposition that a parole board
18  can violate the Eighth Amendment by denying parole. § 2254(d); *see also Wright*, 552
19  U.S. at 123-26; *Moses*, 555 F.3d at 753. Second, Petitioner's life sentence (*see People
20  v. Van Houten*, 113 Cal. App. 3d at 284) is well within the current statutory range
21  contemplated for first degree murder (*see* CAL. PENAL CODE § 190) and the Board
22  cannot *increase* Petitioner's sentence by denying her parole. An indeterminate sentence
23  is in legal effect a sentence for the maximum term unless the Board acts to fix a shorter
24  term. *In re Dannenberg*, 34 Cal. 4th 1061, 1097-98, 23 Cal. Rptr. 3d 417 (2005); *see
25  also People v. Felix*, 22 Cal. 4th 651, 657-59, 94 Cal. Rptr. 2d 54 (2000) (for purposes
26  of California's Determinate Sentencing Act, "both straight life sentences and sentences
27  of some number of years to life are indeterminate sentences . . . .").

28         Third, as discussed in detail above, the Board found Petitioner unsuitable for

parole on August 30, 2007, based on its individual determination that Petitioner posed an unreasonable risk of danger to society if released. *Hayward*, 603 F.3d at 562.  There is nothing on this record to support Petitioner's assertions that a future panel faced with new factors will not find her suitable for parole.

Petitioner's corollary Eighth Amendment claim fails on the merits.

Lastly, to the extent Petitioner appeared before the Board for a subsequent parole consideration hearing while her petition was pending in this court, she has received all the relief a federal habeas court has authority to grant her even if her Petition had merit, which it does not for the reasons discussed above. *Haggard*, 2010 WL 4978842, at *5.

## III. RECOMMENDATION

In accordance with the foregoing, IT IS RECOMMENDED that the court issue an order: (1) approving and adopting this Report and Recommendation; and (2) directing that judgment be entered dismissing this action with prejudice.

Dated:  January 19, 2011                   _____
                                                            ARTHUR NAKAZATO
                                                   UNITED STATES MAGISTRATE JUDGE